**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

United States of America,

               Plaintiff,

    v.

Murrell Vailes,

               Defendant.

Case No. 2:22-cr-00104-JAD-BNW

**REPORT AND RECOMMENDATION**

## I.    Introduction

Before the Court is Defendant Vailes' motion to suppress. ECF No. 22. The government opposed the motion (ECF No. 26), and Vailes replied (ECF No. 29). The Court held a hearing at which the parties stipulated to the admission of the exhibits filed in support of their briefs. ECF No. 32. No testimony or other evidence was admitted into the record. *Id.*

The basic facts of the case are as follows: Las Vegas Metropolitan Police Department (LVMPD) began investigating Vailes for pandering in 2022. *See* ECF No. 22-1 at 4 (the warrant). After a short investigation, LVMPD obtained a search warrant to search Vailes' apartment and his two vehicles. *See* ECF No. 22-1. While executing the warrant, officers observed methamphetamine and several firearms in Vailes' apartment. ECF No. 31-2 at 3-4 (the piggyback warrant). Officers also observed a firearm inside Vailes' Range Rover. *Id.* at 4. Officers paused the search and obtained a piggyback warrant to seize these items. *Id.* As a result of these seizures, Vailes was indicted on two counts: being a felon in possession of a firearm and possession with intent to distribute methamphetamine. ECF No. 1 (indictment).

Vailes now challenges the warrant on two grounds. ECF No. 22. Vailes argues (1) that the warrant was not supported by probable cause and (2) that it was overbroad. *Id.* Vailes argues that because the warrant violated the Fourth Amendment, the evidence seized under the piggyback warrant is the fruit of the poisonous tree and must be suppressed. ECF No. 29 at 11-12. The government disagrees, arguing that the warrant was supported by probable cause and was not

overbroad. ECF No. 26. According to the government, to the extent the warrant was overboard, the doctrine of severance applies and allows for the lawful portions of the warrant to be upheld. *Id.* at 24. At bottom, and assuming any illegalities, the government also relies on the good faith exception to the exclusionary rule to argue that the evidence should not be suppressed. *Id.* at 24-28.

The Court will recommend that Vailes' motion be denied. As discussed in more detail below, there is no need for the Court to analyze whether probable cause existed for the warrant, as it finds that the good faith exception to the exclusionary rule applies. In essence, even if the warrant was not supported by probable cause, it was not so deficient that officers could not reasonably rely on it in good faith. Regarding overbreadth, Vailes has not carried his burden to show that the warrant was overbroad. Accordingly, the Court recommends that Vailes' motion be denied.

In support of this recommendation, the Court summarizes the evidence and analyzes the facts under the applicable law.[1]

**II.    Background**

Detective Perez provided the following information in his affidavit in support of the warrant. ECF No. 22-1.

### A.    Detective Perez's Training and Experience

Detective Perez had been employed with LVMPD for three years. *Id.* at 2. He was assigned to the Vice Section and had been a detective with LVMPD for one month. *Id.* He participated in specialized training in pimp and prostitution subculture. *Id.* at 4.

### B.    Vailes' Conduct at the Gas Station and Burger King

On February 6, 2022, LVMPD conducted an operation in which an undercover female detective posed as a prostitute in a Burger King parking lot. *Id.* at 4.

While the undercover officer was in the Burger King parking lot, Vailes pulled into a nearby gas station in a Ranger Rover. *See id.* He exited his vehicle and watched the undercover

---

[1] Vailes presented several complicated Fourth Amendment issues in his motion. However, he did not examine these issues with much particularity. In the future, the Court encourages counsel to provide more in-depth briefing into the nuisances of the law.

officer and another woman. *Id.* The woman talked to a tow truck driver and then walked away. *Id.* at 4-5. Vailes then drove close to the woman, had a conversation, and drove away. *Id.* at 5.

Vailes then drove into the Burger King parking lot. *Id.* Vailes approached the undercover officer and said, "What's up snow bunny?" *Id.* In the prostitution subculture, "snow bunny" means a white female prostitute. *Id.* Vailes introduced himself as "Pimp Hard," explaining this is his name because he pimps hard. *Id.* In the prostitution subculture, "pimp hard" refers to raising quotas, reducing rest time, and/or forcing prostitutes to take customers they would normally avoid. *Id.* Vailes and the undercover detective then talked for about fifteen minutes. *Id.*

Vailes told the undercover detective that women engage in prostitution for him. *Id.*

Vailes said he gives the prostitutes that work for him "good instructions" to follow while engaging in prostitution. *Id.* at 5. He said that he could provide guidance to the undercover officer, too. *Id.* at 6. In this vein, Vailes told the undercover detective that she should not be working the Tropicana Corridor and could earn more working in the casinos. *See id.* The undercover officer explained that she was nervous to work at the casinos because she did not want to get arrested. *Id.* Vailes advised her that it was okay to get arrested because prostitution was only a misdemeanor. *Id.* Vailes further explained that he does not frequent the track (where prostitutes engage in prostitution) to teach his sex workers how to engage in prostitution but is instead "more of a virtual teacher." *Id.* at 5, 6. He also stated that he would give his workers the "tools to use while they engage in prostitution; however, he cannot be out there with them while engaging in prostitution and stays at his home." *Id.* at 6.

Vailes also said that he frequently travels state to state with sex workers while they engage in prostitution. *Id.* at 6.

Vailes ultimately asked the undercover officer if she was ready to "choose up." *Id.* "Choose up" is phrase used to describe when a prostitute chooses a pimp to work for. *See id.* at 5-6. Vailes advised her that he requires a choose up fee, which is a fee that a pimp expects a prostitute to pay to show her loyalty "in exchange for knowledge of the game." *Id.* Vailes said his choose up fee would be whatever the undercover officer made that night engaging in prostitution.

*Id.* at 6. He also said he would continue to expect all the money she made while prostituting in exchange for assistance with housing, transportation, and bills. *Id.*

The affidavit does not indicate how the undercover officer responded to Vailes' request that she choose up. *See id.* at 6. However, before Vailes left the undercover officer, they exchanged numbers. *Id.*

**C.    Additional Surveillance of Vailes**

After Vailes left the Burger King, officers surveilled him. *Id.* at 6-7. He "was observed 's[w]eating' multiple girls on the Tropicana Corridor . . . ." *Id.* at 7. "Sweating" is a term used in the prostitution subculture to refer to a pimp verbally putting pressure on a sex worker to work for him. *Id.*

**D.    February 6, 2022 Texts Between Vailes and the Undercover Officer**

The same evening Vailes met the undercover officer, he messaged her. *Id.* He asked how much money she made, to which she replied she made $90. *Id.* He then began giving her advice on how to make more money. *See id.* He told her to "keep a trick at the ATM machine." *Id.* When she said that she had a date (i.e., a prostitution client) later, he said, "Break him, tell him your car messed up and you need $800 for a new engine." *Id.* She responded, "800?" *Id.* He said, "Yeah, thinking big." *Id.* She responded that she would try and that the date said he would pay $100 for sexual intercourse. *Id.* Vailes responded, "That's just a sample. Keep him paying [] 5 to 10 minutes max." *Id.*

**E.    February 8, 2022 Communications Between Vailes and the Undercover Officer**

On February 8, 2022, the undercover officer texted Vailes. *Id.* During the conversation, Vailes texted the undercover officer a picture of his "cash app," which is a phone application to send money. *Id.* He said, "If you're serious about choosing up, I need that choosing fee to make it official." *Id.* The officer responded that she only had cash and that she was serious about Vailes. *Id.*

Later that day, Vailes called the undercover officer. *Id.* The undercover officer said that she was likely not going to be on the Tropicana Corridor later, as she was tired. *Id.* at 8. Vailes responded that he would be in that area later and expected his fee. *Id.*

**F.    February 9, 2022 Communications Between Vailes and the Undercover Officer**

On February 9, 2022, Vailes called the undercover officer. *Id.* Vailes said that he had plans to go to San Diego. *Id.* However, he asked if he could stop by on his way out of town to collect his choose up fee. *Id.* She said "no" (as her cousin would be around). *Id.*

Vailes also stated that he was trying to move the undercover officer into his home and help her move her belongings. *Id.*

Vailes called the undercover officer again on February 9, 2022. *Id.* He told her that he was in San Bernardino on a track where his "bottom" and another sex worker were currently engaged in prostitution.[2] *Id.* He said they were getting a lot of dates and would not leave until they were ready to come back with him to Las Vegas. *Id.*

**G.    February 15, 2022 Communications Between Vailes and the Undercover Officer**

On February 15, 2022, Vailes called the undercover officer. *Id.* Vailes told her that she needed to make up her mind and "stop moving [on] her own accord." *Id.* He said that she needed to follow his instructions or "you don't need me." *Id.* Vailes told her that she needed to work on her communication, and she texted later that she was. *Id.* at 8-9.

Later in the day, Vailes texted the undercover officer to go "turn some dates." *Id.* at 9.

**H.    Surveillance of Vailes' Apartment**

Police conducted a records-check that revealed that Vailes' Ranger Rover was parked at Whispering Waters Apartment every night. *Id.* On February 8 and 14, 2022, police also observed Vailes' Ranger Rover parked at these apartments outside Building K. *Id.*

During multiple surveillances conducted at Vailes' residence, no one was observed entering or exiting Vailes' apartment. *Id.*

---

[2] A "bottom" is a sex worker who is at the top of the hierarchy of sex workers for a particular pimp. *Id.*

**I.    Vailes' Arrest**

On February 16, 2022, Detective Perez was conducting surveillance outside Vailes' apartment with other detectives. *Id.* at 9-10. Detective Perez observed Vailes in a Chevy Impala parked in front of Building K. *Id.* at 10. When Vailes exited the Chevy, detectives arrested him for pandering. *Id.*

One detective then interviewed Vailes' neighbor, who said that Vailes was the only person he observed living at the apartment in question. *Id.* The detective also received leasing information from the apartment complex, which indicated that Vailes was the only person registered to the apartment. *Id.*

Officers then obtained the warrant to search Vailes' apartment and vehicles. ECF No. 31-1 at 13.

**J.    The Purpose of the Warrant**

Detective Perez stated at the beginning of his affidavit that he was investigating the crime of "Pandering which occurred at the Burger King" on Tropicana. ECF No. 22-1 at 2. He stated that there was probable cause to believe that the items listed below would be found in Vailes' apartment, Ranger Rover, and Chevy Impala. *Id.* at 3. The items sought to be seized included:

A.    Items of prostitution such as condoms, lubrication, records of prostitution activity, including but not limited to ledgers, diaries, journals, organizers, customer lists, owe sheets, advertisements, and travel documents.

B.    Currency including coins, papers, notes, debit cards, credit cards, and gift cards.

C.    Cellular phones, personal computers, electronic storage devices, and similar electronic items.

D.    Limited items of personal property which [t]end to establish a possessory interest in the items sought to be seized pursuant to this Search Warrant, to include but not limited to personal identification, photographs, utility company receipts[,] addresses envelopes [sic], rent receipts, etc.

*Id.* Detective Perez stated that these items "constitute evidence" tending to show the offense of "Pandering" had been committed. *Id.*

Later in the warrant, Detective Perez stated that he prayed for the search and seizure of "possessory items" "to locate additional victims of sex trafficking." *Id.* at 10.

Detective Perez also provided several statements about why Vailes would have the items sought. He stated:

1. "[C]ellular devices are commonly used for communication with potential victims of sex trafficking." *Id.*
2. "It is in my training and experience that persons involved in prostitution activity will often keep records, ledgers, and diaries documenting the business of prostitution and/or keep track of monies earned, customer lists and owe sheets." *Id.*
3. "Pimps and prostitutes also need certain tools of the trade such as cellular telephone[s] and business cards to apply the prostitution trade and to communicate with each other and customers that seek out other illegal services." *Id.*
4. "It is also known that panderers/human traffickers will often give their victims that work for them condoms to use during sex acts." *Id.* at 11.
5. "[P]imps and human traffickers will frequently be in possession of items documenting travel to various cities. Prostitution is a transient activity and pimps/human traffickers will frequently transport prostitutes to other cities in order to work . . . ." *Id.*
6. "It is also common for pimps/human traffickers to keep photographs of the prostitutes who work for them . . . These photographs are also used to advertise on the internet. Often these images will be stored on discs, cellphones, computers, electronic tablets, digital cameras or taken with disposable and/or regular film cameras." *Id.*
7. "Pimps and human traffickers will commonly be in possession of large amount[s] of money due to [] most commercial sex customers paying in cash . . . ." *Id.*

Based on all the information provided by Detective Perez, the state court judge issued the warrant. *Id.*

Vailes now challenges the issuance of this warrant.

## III.    Analysis

### A.    The Warrant Sought Evidence of Pandering, Not Sex Trafficking

At the outset, the Court addresses Vailes' argument (as developed more fully during oral argument) that the warrant was "really" about sex trafficking (not pandering), and therefore, the Court should analyze whether there was probable cause to search Vailes' apartment and vehicles for evidence of sex trafficking. As explained below, the Court disagrees with this argument.

The warrant included facts suggesting that Vailes pandered women (as opposed to sex trafficked women) and sought evidence of that offense. Several facts support this conclusion.

1   First, the affiant explained that he was investigating the crime of pandering (*id.* at 2) and stated

2   that the items sought to be seized tended to show that pandering had been committed (*id.* at 3).

3   Second, and of particular importance, the affidavit explained that probable cause for *pandering*

4   had been developed. *Id.* at 9. Third, the affidavit provides many facts that support the notion that

5   Vailes pandered the undercover officer and other women (as discussed in more detail below) and

6   provides *no details* about Vailes sex trafficking anyone. *See* ECF No. 22-1. Fourth, the warrant

7   notes that the items to be seized would demonstrate that the crime of pandering had been

8   committed. ECF No. 31-1 at 13. The Court would need to ignore all these statements and facts to

9   conclude that the warrant relates to sex-trafficking as opposed to pandering.

10          By contrast, the warrant did not seek to locate sex trafficking victims. Vailes' argument

11   that the warrant seeks sex trafficking victims is based on the following sentence in the affidavit:

12   "Your affiant prays for the search and seizure of *possessory items* located inside Vailes[']

13   residence and both vehicles in an attempt *to locate additional victims of sex trafficking*." ECF No.

14   22-1 at 10 (emphasis added). To the extent Vailes argues that officers were attempting to locate

15   *victims* inside Vailes' residence and vehicles, the warrant does not support this argument; the

16   warrant states that officers were looking for "possessory items." *Id.*

17          Further, whether officers were looking for the items sought to be seized for the incidental

18   purpose of later locating additional victims of sex trafficking is irrelevant to whether the warrant

19   was properly issued based on a pandering offense. *See United States v. Ewain*, 88 F.3d 689, 694

20   (9th Cir. 1996) (ulterior motives do not determine whether a warrant was properly issued).

21   "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."

22   *Whren v. United States*, 517 U.S. 806, 813 (1996). "[T]he Fourth Amendment's concern with

23   'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the

24   subjective intent." *Id.* at 814. Indeed, the Ninth Circuit has upheld searches when a warrant is

25   issued for one crime and officers purposefully look for evidence of another crime in the places

26   they could lawfully search. *See, e.g.*, *Ewain*, 88 F.3d 689. "A policeman's pure heart does not

27   entitle him to exceed the scope of a search warrant, nor does his ulterior motive bar a search

28   within the scope of the warrant, where the warrant was properly issued." *Id.* at 694. Accordingly,

1    here, it is irrelevant if officers hoped the evidence of pandering (such as ledgers, journals, owe

2    sheets, cell phones, etc.) would help them locate victims of sex trafficking.

3        Because the Court finds that the warrant sought evidence tending to show Vailes

4    committed a pandering offense, the Court need not analyze whether there was probable cause to

5    believe Vailes' apartment or vehicles would contain evidence of sex trafficking.

6    **B.    The Good Faith Exception Applies to the Search of Vailes' Home and Range
7    Rover for Evidence of Pandering, Even if Probable Cause Did Not Exist**

8        **i.    Probable Cause**

9    The Fourth Amendment provides,

10
11   The right of the people to be secure in their persons, houses, papers, and effects,
     against unreasonable searches and seizures, shall not be violated, and no warrants
     shall issue, but upon probable cause, supported by oath or affirmation, and
12   particularly describing the place to be searched, and the persons or things to be
     seized.
13

14   U.S. CONST. AMEND. IV. In other words, warrants must (1) be supported by probable cause and

15   (2) specifically describe both the place to be searched and what is to be seized.

16       "Probable cause exists when, under the totality of the circumstances, 'there is a fair

17   probability that contraband or evidence of a crime will be found in a particular place.'" *United*

18   *States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006); *see United States v. SDI Future Health, Inc.*,

19   568 F.3d 684, 703 (9th Cir. 2009) (providing same rule).

20       When analyzing whether probable cause exists to search for certain items, courts may rely

21   on an officer's training and experience explaining that people who commit certain types of crimes

22   will likely possess certain evidence. *See, e.g.*, *United States v. Martinez*, 811 F. App'x 396, 399

23   (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2526 (2021); *United States v. Crews*, 502 F.3d 1130,

24   1136-37 (9th Cir. 2007).

25       For probable cause to exist to search a particular place, there must be a sufficient nexus

26   between the place to be searched and the evidence sought. *Crews*, 502 F.3d at 1136–37 ("For

27   probable cause, an affidavit must establish a reasonable nexus between the crime or evidence and

28

the location to be searched."); *see also Johnson v. Walton*, 558 F.3d 1106, 1111 (9th Cir. 2009) (probable cause to search a home exists when there is "a sufficient nexus between the residence and the contraband sought."). The relevant question is whether it would be reasonable to seek the evidence sought in the place to be searched. *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (the issuing-judge need not conclude that the evidence is more likely than not in the place to be searched; the judge need only conclude that it would be reasonable to search for the evidence there); *Johnson*, 558 F.3d at 1111 (to search a particular residence, the issuing-judge must conclude it would be reasonable to seek the evidence at the residence); *Crews*, 502 F.3d at 1137 ("It need only be reasonable to seek the evidence at the location indicated in the affidavit."). In making this determination, judges may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Blight v. City of Manteca*, 944 F.3d 1061, 1067 (9th Cir. 2019) (cleaned up); *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990) (same rule).

Before determining whether a warrant was supported by probable cause, however, courts "may proceed directly to" whether the good faith exception applies. *Crews*, 502 F.3d at 1136. Thus, the Court turns to that analysis.

### ii.      The Good Faith Exception

Evidence seized pursuant to a facially valid search warrant that later is held to be invalid may still be admissible, if officers acted in good faith and in reasonable reliance on the warrant. *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013); *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995). "The government bears the burden of proving that reliance upon the warrant was objectively reasonable." *Kow*, 58 F.3d at 428; *see also United States v. Camou*, 773 F.3d 932, 944 (9th Cir. 2014) ("The burden of demonstrating good faith rests with the government.").

"A warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *United States v. Leon*, 468 U.S. 897, 922 (1984) (cleaned up). However, the officer's reliance on the judge's determination that the warrant is sufficient must still be objectively reasonable. *Id.*

An officer's reliance on a warrant will *not* be objectively reasonably

(1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge wholly abandons his or her judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Underwood*, 725 F.3d at 1085 (cleaned up).

Here, the parties' dispute about whether the good faith exception applies centers around whether the affidavit was so lacking in indicia of probable cause that it rendered officers' belief in it entirely unreasonable. *See* ECF No. 22 at 12-13; ECF No. 26 at 24-28; ECF No. 29 at 12. An affidavit falls to this level when it does not provide even a "colorable argument" for probable cause. *Underwood*, 725 F.3d at 1085. A "colorable argument" is made when thoughtful, competent judges could disagree about the existence of probable cause. *Id.*

### a.    There Was a Colorable Argument for Probable Cause to Believe that Vailes Was Engaged in Pandering

There was more than a colorable argument for probable cause to believe that Vailes pandered multiple women. ECF No. 22-1. Pandering is the act of inducing an adult (without physical force or threat of force) to become a prostitute or to continue engaging in prostitution. Nev. Rev. Stat. Ann. § 201.300(1) (West); *see* ECF No. 22-1 at 9 (alleging Vailes violated this statute). The affidavit detailed how Vailes tried to induce the undercover officer to continue prostituting for him. ECF No. 22-1 at 5-6, 7, 8-9. He also told her that he had other women working for him as prostitutes. *Id.* at 5, 6. At one point, he also informed her that he was in San Bernadino with other prostitutes who were working for him. *Id.* at 8.[3]

---

[3] The Court agrees with Vailes that Detective Perez did not provide any facts to support his conclusion that officers saw Vailes "sweating" other women. *See id.* at 6-7. As such, the Court does not rely on this assertion in the affidavit. *See Underwood*, 725 F.3d at 1081 ("Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause.").

1

2

**b.      There Was a Colorable Argument for Probable Cause to Believe that Vailes Possessed the Items Sought to be Seized**

The affidavit provided a colorable argument that Vailes had at least some of the items

sought.[4] In other words, and as explained below, thoughtful, competent judges could disagree

about whether probable cause existed to search for the items sought.

The warrant sought records of prostitution activity (ECF No. 22-1 at 3), and Detective

Perez noted that (based on his training and experience) panderers often keep records of monies

earned, customer lists, and other documents relating to their prostitution business (*id.* at 10). *See*

*United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) ("issuing judges may rely on

the training and experience of affiant police officers."); *United States v. Chiochiu*, No.

217CR00306JCMPAL, 2019 WL 3310461, at *5 (D. Nev. Apr. 10, 2019) ("An officer's 'first

hand knowledge' of a defendant's criminal conduct, combined with the officer's 'experience'

with other individuals who committed similar crimes, provides a 'substantial basis' for a

magistrate judge to determine that probable cause exists.").[5] The warrant sought travel documents

(*id.* at 3), and Detective Perez noted that pimps frequently possess items documenting travel to

various cities (*id.* at 11). Additionally, Vailes told the undercover officer that he frequently travels

state-to-state with sex workers (*id.* at 6) and was in San Bernadino with sex workers on February

9, 2022 (*id.* at 8). The warrant sought currency (*id.* at 3), and Detective Perez noted that pimps

commonly possess large amounts of money because most prostitution customers pay in cash (*id.*

at 11). Additionally, Vailes attempted to collect his choose up fee from the undercover officer in

cash (after he could not collect it over his cash application). *Id.* at 7-8. The warrant sought cell

phones (*id.* at 3), and Detective Perez noted cell phones are commonly used to communicate with

victims (*id.* at 10). The affidavit also suggests that Vailes was using a cell phone to call and text

---

[4] To the extent there was not probable cause, or at least a colorable argument for probable cause, that Vailes would have all the evidence sought, this goes to whether the warrant was overbroad and will be discussed below.
[5] The Court acknowledges that Detective Perez only had three years of experience with LVMPD and one month as a detective when he authored his affidavit. ECF No. 22-1 at 2. While this is not the lengthiest experience, the Court has not found any controlling authority suggesting that the issuing-judge was *not* entitled to rely on the detective's training and experience because of its duration. Accordingly, the Court is left with Ninth Circuit precedent that explicitly allows the issuing-judge to rely on Detective Perez's training and experience.

the undercover detective about her prostituting for him.[6] *See* ECF No. 22-1. These facts would permit a thoughtful, competent judge to conclude that there was a fair probability that Vailes possessed at least some of the items sought. *See Underwood*, 725 F.3d at 1085 (a "colorable argument" is made when thoughtful, competent judges could disagree about the existence of probable cause).

        **c.**      **There Was a Colorable Argument for Probable Cause to Believe that Vailes Lived at the Apartment to be Searched**

There was more than a colorable argument for probable cause that Vailes' lived at the apartment that was searched. Detective Perez received leasing information from the apartment complex indicating that the apartment was leased to Vailes. *Id.* at 10. Additionally, a neighbor indicated that Vailes lived at the apartment. *See id.* Finally, the affidavit established that the Range Rover officers saw Vailes driving parked at the apartment every night. *Id.* at 9. All this evidence suggested that Vailes lived at the apartment that was searched.

        **d.**      **There Was a Colorable Argument for Probable Cause that the Evidence Sought Would be Kept at Vailes' Apartment**

There was a colorable argument for probable cause that the evidence sought would be kept at Vailes' apartment. That is, thoughtful and competent judges could disagree about whether it was reasonable to search Vailes' apartment for the items sought. *See Underwood*, 725 F.3d at 1085 (a "colorable argument" is made when thoughtful, competent judges could disagree about the existence of probable cause); *Ruiz*, 758 F.3d at 1148 (probable cause exists to search a particular place if it is reasonable to search for the evidence there). In other words, a thoughtful, competent judge could believe it was reasonable to search Vailes' apartment for the items sought based on reasonable inferences about where the evidence was likely to be kept. *See Blight*, 944 F.3d at 1067 (judges may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."). Here, a thoughtful, competent

---

[6] While defense counsel noted at the hearing that officers found Vailes' cell phone on his person when he was arrested, this fact was not stipulated to or otherwise admitted into evidence. As such, the Court cannot and does not consider it.

1    judge could believe it was reasonable that Vailes would keep evidence of his pandering activities

2    (such as cash, records of prostitution activity, and travel documents) in his residence.

3              The Ninth Circuit reached a similar conclusion in *Johnson v. Walton*, 558 F.3d 1106 (9th

4    Cir. 2009). In that case, officers had evidence that a business was a front for a prostitution house.

5    *Id.* at 1108-09. Officers also had information that the woman who owned and operated the

6    business/prostitution house lived at a particular address (separate from the business). *Id.* Officers

7    obtained a warrant to search her home without anything explicit indicating that evidence of her

8    crimes would be located at her home. *See id.* at 1109. The Ninth Circuit upheld the warrant under

9    the good faith exception. *Id.* at 1111-12. The court explained that

10            [a] better warrant application in this case would have explicitly stated that, in [the
11            officer's] investigative experience, she knows that owners of prostitution houses
              often keep evidence of these illegal businesses, including money from the
12            businesses, in their homes. Nevertheless, [the officer's] affidavit is not so lacking
              in indicia of probable cause so as to render a reasonable officer's belief in the
13            existence of probable cause unreasonable.

14   *Id.* at 1111.

15            Based on all these facts, the Court finds that the affidavit provided at least a colorable

16   argument that probable cause existed to search Vailes' apartment for evidence of pandering. Like

17   in *Johnson*, a better warrant application in this case would have explained that in Detective

18   Perez's training and experience, pimps usually keep evidence of their pandering activities (such

19   as cash and travel documents) in their homes. However, the affidavit was not so lacking in indicia

20   of probable cause that the items would be in Vailes' apartment so as to render an officer's belief

21   in it unreasonable.

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     **e.**      **There Was a Colorable Argument for Probable Cause that the Evidence Sought Would Be Kept in Vailes' Range Rover[7]**

There was a colorable argument for probable cause to believe that Vailes' owned or controlled the Ranger Rover. Officers saw Vailes driving the Range Rover the night that he met the undercover officer and asked her to work for him. ECF No. 22-1 at 4, 5. A records check also revealed that the Range Rover parked outside Vailes' apartment every night. *See id.* at 9.

The affidavit provided a colorable argument that Vailes would have at least some of the items sought in his Range Rover. Thoughtful and competent judges could disagree about whether it was reasonable to search the Range Rover for the items sought. *See Underwood*, 725 F.3d at 1085 (a "colorable argument" is made when thoughtful, competent judges could disagree about the existence of probable cause); *Ruiz*, 758 F.3d at 1148 (probable cause exists to search a particular place if it is reasonable to search for the evidence there). In other words, a thoughtful, competent judge could believe it was reasonable to search the Range Rover for some of the items sought based on reasonable inferences about where the evidence was likely to be kept.[8] *See Blight*, 944 F.3d at 1067 (judges may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."). Here, a thoughtful, competent judge could believe it was reasonable that Vailes would keep evidence of his pandering activities (such as cash, travel documents, items of prostitution, and items of a possessory interest) in the Range Rover. The affidavit indicated that Vailes pandered women from this vehicle, as he did with the undercover officer. ECF No. 22-1 at 4-5. As such, a colorable argument for probable cause existed to search the Range Rover.

---

[7] The Court will not analyze whether probable cause existed to search the Chevy Impala. No evidence was found in the Chevy Impala. *See* ECF No. 31-2 (piggyback warrant describing the firearms and narcotics evidence found in Vailes' apartment and Range Rover). Accordingly, even assuming for the sake of argument that no probable cause existed to search the Chevy Impala, the remedy would be for the Court to sever this portion of the warrant. *See Greenstreet v. Cnty. of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994) (there must be probable cause to search each location in a multi-location search warrant); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009) (court may sever those portions of the warrant that are invalid and preserve the rest). And Vailes has not advanced any argument regarding why severing the Chevy Impala from the warrant should change the Court's conclusion.

[8] Again, whether it was reasonable to search for all the items in the Ranger Rover will be dealt with in the overbreadth section.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**f.    Officers Acted in Good Faith and In Reasonable Reliance on the Warrant**

Having concluded that the affidavit was not so lacking in indicia of probable cause so as to render officers' belief in it unreasonable, the Court turns to whether the officers otherwise acted in good faith and in reasonable reliance of the warrant. The record supports the conclusion that officers reasonably relied on the warrant in good faith. Officers obtained a telephonic search warrant from a state court judge. ECF No. 22-1. District Attorney Frank LoGrippo reviewed the warrant before Detective Perez presented it to the state court judge. *Id.* at 12. Having a district attorney review a warrant before submitting it to a judge supports the notion that officers reasonably believed the warrant was supported by probable cause. *Messerschmidt v. Millender*, 565 U.S. 535, 553–55 (2012). Accordingly, the Court finds that officers acted in good faith in relying on the warrant, and the government met its burden to show that the good faith exception applies (based on the records admitted into evidence).

**C.    Vailes Did Not Carry His Burden to Show that the Warrant Was Overbroad**

Having established that the good faith exception cures any deficiencies there may have been regarding the existence of probable cause to believe items of pandering would be found in Vailes' home or car, the Court next turns to whether the warrant was overbroad.

The burden is on the defendant who seeks to suppress evidence obtained pursuant to a warrant to show that the warrant was defective. *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir. 1962); *United States v. Washington*, No. CR S-11-00345 KJM, 2012 WL 3638227, at *6 (E.D. Cal. Aug. 22, 2012) ("When the results of a warrant-based search are challenged in a motion to suppress, the defendant bears the burden of demonstrating that the search is unreasonable under the Fourth Amendment.").

The Fourth Amendment requires that a warrant specifically describe both the place to be searched and the person or things to be seized. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The Ninth Circuit describes this requirement as one of "specificity" and has "distinguished its 'two aspects': 'particularity and breadth . . . Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of

1   the warrant be limited by the probable cause on which the warrant is based." *United States v. SDI*

2   *Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009).

3       Courts must consider three factors in analyzing whether a warrant is overbroad: "(1)

4   whether probable cause existed to seize all items of a category described in the warrant; (2)

5   whether the warrant set forth objective standards by which executing officers could differentiate

6   items subject to seizure from those which were not; and (3) whether the government could have

7   described the items more particularly in light of the information available . . . ." *United States v.*

8   *Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015).

9       Vailes argues that each of these factors suggests that the warrant was overbroad. As

10  explained below, the Court disagrees with Vailes' arguments.

11      **i.    Whether Probable Cause Existed to Seize All Items of a Category**

12      Vailes argues that there was not probable cause to seize certain items. ECF No. 22 at 9-11.

13      First, Vailes asserts that the activities described in the affidavit did not provide probable

14  cause that evidence of a crime would be found on his cellphone or other electronic devices. *Id.* at

15  10. The Court disagrees. The warrant summarized several text message conversations between

16  Vailes and the undercover officer that suggested he was engaged in pandering. *See* ECF No. 22-1

17  at 7, 9 (Vailes and the undercover officer texted about the officer turning "tricks;" Vailes asked

18  for his choose up fee; and Vailes told the undercover officer to "go turn some dates"). Probable

19  cause existed to search Vailes' cell phone. Whether there was probable cause to search Vailes'

20  other electronic devices is a harder question, but Vailes has not developed this argument. *See* ECF

21  No. 22 at 10 (stating only that the affidavit did not "provide probable cause that evidence of a

22  crime would be found on his cellphone or other electronic devices included in category C."). *See*

23  *Greenwood v. Fed. Aviation Admin*., 28 F.3d 971, 977 (9th Cir. 1994) (courts will not

24  manufacture arguments for litigants).

25      Second, Vailes also argues that there was not probable cause to search for currency,

26  condoms, or photos because there was no evidence that Vailes gave the officer condoms, took

27  cash from her, or took photographs of her. ECF No. 22 at 10-11. Again, the Court disagrees with

28  Vailes. Regarding condoms, Detective Perez noted that panderers often give their victims

condoms to use during sex acts. ECF No. 22-1 at 11. The Court finds that Detective Perez's statement, combined with all the evidence in the affidavit that Vailes was engaging in pandering, established probable cause (or a fair probability) that Vailes would have condoms. Regarding currency, the affidavit explained that Vailes' asked to pick up his choose up fee in cash (*id.* at 8); he told the undercover detective that he would expect all the money she made each night (*id.* at 6); and he had other women working for him as prostitutes (*id.* at 5, 6, 8). Detective Perez also noted that it is common for panderers to possess large amounts of cash because most commercial sex customers pay in cash. *Id.* at 11. These facts established probable cause to believe that Vailes was pandering multiple women, took their money, and accordingly, would have currency related to his pandering activities. Regarding photos, Detective Perez noted that it is common for panderers to keep photos of prostitutes who work for them. *Id.* The Court finds that Detective Perez's statement, combined with all the evidence in the affidavit that Vailes was engaging in pandering, established probable cause to search for photos.

ii.     **Whether the Warrant Provided Objective Standards for Differentiating Items Subject to Seizure From Those Which Were Not**

Vailes argues that the warrant failed to set forth objective standards by which officers could differentiate items subject to seizure from those that were not. ECF No. 22 at 11-12. Vailes argues that the warrant does not set a standard for officers to differentiate items subject to seizure from those that are ordinarily found in a home or vehicle. *Id.* at 11. In his reply, Vailes elaborates on this argument by noting that almost every home in America would contain the items subject to seizure: condoms, lubrication, bank cards, money, cellphones, computers, and documents showing who lives at the residence. *See* ECF No. 29 at 9-10. The Court agrees that most homes in America may contain these items. The Court does not agree that this means the warrant failed to provide objective standards by which officers could differentiate items subject to seizure from those that were not. In other words, just because most homes in America may have the items subject to seizure does not mean that officers did not know what items they were authorized to seize in Vailes' home. And Vailes has not otherwise explained why or how the warrant failed to

provide objective standards by which officers could differentiate items subject to seizure from those that were not.

### iii.    Whether the Government Could Have Described the Items More Particularly

Vailes argues that Detective Perez could have described the items more particularly considering the information available at the time the warrant issued. ECF No. 22 at 12. However, Vailes does not provide any relevant analysis of this factor or explain how the items could have been described more particularly. *See id.* Instead, Vailes states that Detective Perez had no information that Vailes was using his home or vehicles for criminal activity. *Id.* This assertion goes to whether there was a sufficient nexus between the places to be searched and the things to be seized,[9] not whether Detective Perez could have described the items more particularly. Vailes also states that Detective Perez knew that Vailes was the sole occupant of the apartment. *Id.* This statement also does not go to whether the items to be seized could have been described more particularly. Finally, Vailes states that Detective Perez only had information that Vailes was pandering the undercover officer, and as such, the warrant should have been limited to items relevant to pandering the undercover officer. *Id.* This statement is factually incorrect and does not go to whether Detective Perez could have described the items more particularly. As explained above, the affidavit established probable cause that Vailes was pandering multiple women, including (at least) the undercover officer, his bottom, and another sex worker in San Bernadino. *See* ECF No. 22-1 at 5-6, 8. But even if the Detective Perez only had information that Vailes was pandering the undercover officer, Vailes does not explain how the categories of items sought to be seized could and should have been described more particularly. *See* ECF No. 22 at 12.

Accordingly, Vailes did not carry his burden to show that the warrant was overbroad.

### IV.    Conclusion

**IT IS THEREFORE RECOMMENDED** that Defendant's motion to suppress (ECF No. 22) be DENIED.

---

[9] The Court explained above why there was a sufficient nexus between Vailes' apartment and his Range Rover and the things to be seized.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE**

   This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

   DATED: January 6, 2023

                      _____
                      BRENDA WEKSLER
                      UNITED STATES MAGISTRATE JUDGE